**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division**

| | |
|---|---|
| **SERI IRAZOLA,** | |
| *Plaintiff,* | |
| v. | **Case No.: 1:19-cv-554-LO-MSN** |
| **FORS MARSH GROUP,** | |
| *Defendant.* | |

**PLAINTIFF'S FIRST AMENDED CIVIL COMPLAINT FOR EQUITABLE
AND MONETARY RELIEF AND DEMAND FOR JURY**

Plaintiff Seri Irazola ("Plaintiff" or "Irazola") brings this first amended civil complaint against Defendant Fors Marsh Group ("FMG") for: illegal retaliation in violation of False Claims Act, 31 U.S.C. § 3730(h) ("FCA"), illegal retaliation and discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), and illegal retaliation in violation of the 2013 National Defense Authorization Act, 41 U.S.C. § 4712 ("NDAA").

**INTRODUCTION**

1.  FMG is a government contractor specializing in, among other things, marketing, communications, and organizational behavior research.

2.  FMG extended a job offer to Irazola in June of 2017 as the Director of Public Policy Evaluation.

3.  Throughout most of her tenure at FMG, Irazola was exposed to demeaning and sexist comments. For example, Brian Griepentrog ("Griepentrog"), a minority owner of FMG,

said of one departing female director: "No *woman* is worth that," referring to the amount of money the female director had requested.

4.     In March 2018, Griepentrog made a similar comment about another female employee, Carrie Von Bose ("Von Bose").  Griepentrog said of Von Bose that: "she thinks that she was worth more than she actually is," or words to that effect.

5.      Shortly after Griepentrog's comment about Von Bose, Irazola attended a private meeting with CEO Sean Marsh ("Marsh"), majority owner and co-founder of FMG.  Irazola and Marsh discussed the "hostile work environment" in which Irazola found herself working.

6.     Throughout her tenure, Irazola observed conduct and communications that she, a former Director at the Department of Justice ("DOJ"), believed to be in violation of contracting laws and regulations.

7.     Specifically, FMG officials were in regular contact with program leadership and contracting personnel from the Federal Voting Assistance Program ("FVAP") in an effort to manipulate the upcoming re-competition ("recompete") for the FVAP's indefinite delivery, indefinite quantity ("IDIQ") and the upcoming recompete for the Office of People Analytics ("OPA") so that FMG could more easily compete for the award, and in the words of Griepentrog to Irazola: "maximize [their] workshare."

8.     For contracting, general questions are allowed, and agencies typically publish written questions and corresponding answers on their webpage for full transparency to all applicants.

9.     However, questions about how to manipulate a contract so that the incumbent can win are not permitted or legal.

10.     The questions that FMG was "asking" were designed to make sure FMG would be in a better situated position than their competition and were not posted on the question and answer section of the DoD's web page as part of the application.

11.     Generally, the government opens a window of time for applicants to ask questions, then closes that time period, then the government publicly posts the answers; these questions FMG were asking and getting answered were outside of that window.

12.     FMG was working with the Directors of both FVAP and OPA to ensure FMG was set to win the recompetes, and that the amount of money was maximized.

13.     Irazola directed her concerns about such communications directly to Griepentrog who stated: "That's how we do it here and that's part of your job now."

14.     In or about March of 2018, Irazola, believing herself to be within earshot of Griepentrog, reiterated her concerns to Mary Beth Lombardo ("Lombardo"), a Business Development Specialist at FMG, when Irazola discussed the improper communications between FMG and certain government employees.  Lombardo told Irazola in or around early April of 2018 that Lombardo had relayed Irazola's concerns to Fahima Vakalia ("Vakalia"), Director of Business Development at FMG.  Vakalia reports directly to Ben Garthwaite ("Garthwaite"), one of FMG's owners.

15.     Less than one month after Irazola's discussion with Marsh about the "hostile work environment" and in the weeks following her discussion with Lombardo in front of Griepentrog about improper communications between FMG and certain government employees, FMG terminated Irazola's employment.

## JURISDICTION AND VENUE

16.     This Court has personal jurisdiction over FMG because FMG conducts regular

business in Virginia and maintains regular and systematic contacts with Virginia.

17.     This Court has subject matter jurisdiction over the claims in the Complaint

because this is a civil action with federal questions that arise under the laws of the United States.

18.     Venue is proper in this Court because FMG maintains its business within

Arlington County and transacts business in Arlington County which is contained in the Eastern

District of Virginia and in this Court's Alexandria Division.

## PROCEDURAL BACKGROUND

19.     On June 26, 2018, Irazola filed a charge of retaliation and discrimination on the

basis of gender with the U.S. Equal Employment Opportunity Commission ("EEOC").

20.     The EEOC issued Irazola a Notice of Right to Sue on February 13, 2019.

21.     On June 22, 2018, Irazola filed an administrative complaint of retaliation with the

DoD/OIG, alleging violations of the NDAA, 41 U.S.C. § 4712.

22.     Irazola's 210-day administrative exhaustion period concluded on January 22,

2019.  Accordingly, Irazola has exhausted her administrative remedies and this matter is now

properly before the Court.

23.     On March 19, 2019, Irazola filed a civil complaint in the Circuit Court for

Arlington County.

24.     On May 7, 2019, FMG filed a notice of removal to the United States District

Court for the Eastern District of Virginia.

25.     On May 24, 2019, FMG filed a motion to dismiss which Irazola filed an

opposition to on June 14, 2019.

26.     FMG replied to Irazola's opposition on June 21, 2019.

27.     This Court dismissed Irazola's complaint without prejudice on June 28, 2019 and granted Irazola thirty days to amend.

## PARTIES

28.     Irazola is a resident of Loudoun County, Virginia, and was hired by FMG as its Director of Public Policy Evaluation in June 2017 and started working at FMG on August 28, 2017.  Irazola started working at FMG on August 28, 2017, after completing her duties at the DOJ.  Irazola holds a Ph.D. in Social Policy from American University.

29.     Defendant FMG is an applied research company which works primarily with federal government clients.

30.     FMG is incorporated in Virginia and headquartered in Arlington, Virginia.

## FACTUAL ALLEGATIONS

### Background

31.     FMG is owned by three men:  Marsh, Garthwaite, and Griepentrog.

32.     On August 28, 2017, Irazola started working at FMG as its Director of Public Policy Evaluation.  In or around February 2018, FMG promoted Irazola and three other Directors to the positions of Vice President of their respective focus areas.  During Irazola's tenure, she acquired new business and established and maintained important client relationships.  Irazola's work was pivotal in FMG's award of a contract with Cadmus -- a partner organization -- that was valued at $8 million.

33.     Irazola previously worked at the DOJ as the Director of the Office of Research and Evaluation at the National Institute of Justice.

34.     In this capacity and role in the Department of Justice, Irazola was interviewed by

the Office of Special Counsel ("OSC") and the Office of Inspector General ("OIG") regarding improper relationships between government personnel and current and/or potential contractors and grantees.  Specifically, Irazola was called to provide information in an investigation as to whether certain government employees were committing waste, fraud and abuse by providing applicants with unfair advantages and contravening federal acquisition regulations.  She was in this role educated by the OIG and the OSC as to what was allowed and what was not allowed in the government contracting process.

35.     Irazola witnessed the consequences of similar misconduct by another former employer, ICF International ("ICF").  The government excluded ICF, the incumbent, from competing on an $8 million contract because of improper communications between an ICF employee and the government.  As a result, ICF terminated the individual who was improperly communicating with the government.

***Whistleblower Retaliation***

36.     In or around September 2017, Irazola and Griepentrog met with David Beirne ("Beirne"), FMG's client from the FVAP.  Beirne works for OPA, under the Department of Defense.

37.     FVAP is a voter assistance and education program that ensures that members of the U.S. military, their family members, and U.S. citizens overseas are aware of their right to vote and that they have resources to do so.

38.     FVAP was established by the Department of Defense ("DoD") and sits within OPA.

39.     Beirne is the Director of FVAP.  Nate DuBois ("DuBois") is the FVAP Contracting Officer's Representative ("COR"). Matt Boehmer ("Boehmer") is the Director of the

6

OPA.

40.     During this September 2017 meeting, Griepentrog and Beirne discussed the upcoming recompete of the FVAP IDIQ contract.  Information for the IDIQ had not yet been released to the public.

41.     In an Uber ride following this September 2017 meeting, Irazola told Griepentrog that she felt uncomfortable being part of these discussions since clearly FMG was getting an unfair advantage over its competition from Beirne, the Director of FVAP.  Griepentrog told Irazola that it was "part of her job" and that "this is the way FMG does business and this is the way I expect you to do business," or words to that effect.

42.     Around November or December 2017, Griepentrog asked Irazola to contact Beirne to get information on the upcoming recompete of FVAP's 5-year IDIQ contract that was not yet released.

43.     Irazola asked her subordinate, Krysha Gregorowicz ("Gregorowicz"), if Gregorowicz had been asked to do this in the past.  Gregorowicz said she had and that she was frequently in contact with FVAP staff – including the FVAP COR – to get information.

44.     Irazola told Gregorowicz that this was not legal.

45.     Gregorowicz told Irazola that the three FMG owners, Griepentrog, Marsh, and Garthwaite, had a personal relationship with Boehmer and, through this relationship, Boehmer had suggested to Jason Fors ("Fors") and to Marsh that they should start a company so Boehmer could "throw business their way."

46.     OPA has been FMG's largest revenue source since FMG was created in 2002, though OPA has evolved over the years and gone by other names.

47.     Between December 2017 and February 2018, Griepentrog asked Irazola multiple

times to contact Beirne to gain information on the task orders and RFP for the FVAP Project and upcoming FVAP IDIQ recompete.

48.    In February 2018, Irazola, Garthwaite, Lombardo and another FMG employee attended a call with Beirne and DuBois to discuss ways in which FVAP should structure the recompete contract so that FMG could submit a winning bid for the FVAP IDIQ recompete.

49.    Beirne solicited input from Garthwaite as to whether FMG would prefer the contract for the FVAP IDIQ be "full and open" or be set aside for small businesses.  Specifically, Beirne asked if FMG was willing to "fight with the big dogs, and compete full and open," or words to that effect.

50.    Garthwaite replied that while not preferable, if that was the only way FMG could win the work in total, FMG could compete full and open.  Beirne then said he would push the contracting officer to make the RFP full and open.

51.    If the RFP was set aside for a small business, FMG would not have been able to win the work in total.

52.    Following the call, Irazola, believing she was in the presence of Griepentrog, stated to Lombardo that conversations like the one between Garthwaite and Beirne should not be happening.  Irazola further stated (in a loud enough voice so as to be overheard by Griepentrog) it was inappropriate for contractors – in particular, incumbents - to speak with members of the government about how to structure a solicitation as doing so could evidence a conflict of interest and fraud.  Lombardo commented that such conduct was "rampant" in the business development office at FMG and that Lombardo witnessed more than one inappropriate phone call between Garthwaite and Boehmer.  In late February 2018, Irazola received a phone call from Beirne. Beirne was enraged because the contracting officer would not make the FVAP recompete RFP

full and open.

53. Around this same time, Griepentrog told Irazola that Griepentrog was going to approach Boehmer and talk to him about structuring the procurement in a way that would ensure FMG remained the contractor for both the FVAP and OPA recompetes.

54. At Griepentrog's instruction, Irazola sent Beirne text messages asking for details on the recompete such as the length of the project. Beirne provided the details as requested, via text.

55. On March 7, 2018, Irazola texted Griepentrog to let him know that Beirne was going to restructure the upcoming FVAP recompete contract to accommodate FMG. Beirne intended to break out the survey work -- which comprised of more than 65% of the FVAP contract dollar amount -- and put that work under a full and open OPA solicitation, thus allowing FMG to serve as the prime contractor.

56. On March 8, 2018, Griepentrog replied: "Ok, this is good. Sounds like him [Beirne] and Matt [Boehmer] spoke."

57. On or about April 3, 2018, an in-person meeting was convened that included Irazola, Gregorowicz, Garthwaite, Lombardo, and Vakalia. The goal of this meeting was to strategize the best way to staff the upcoming recompete for the FVAP project, where FMG would be the sub-contractor.

58. After that April 3, 2018 meeting, Irazola, during an open-door conversation with Lombardo, again disclosed her discomfort with the contacts between FMG and the government.

59. Shortly after this conversation, Lombardo's supervisor, Vakalia who reports directly to Garthwaite, asked Lombardo if Irazola was uncomfortable and no longer wanted to be part of these discussions with FVAP. Lombardo responded that "Seri [Irazola] is concerned that

this communication between FMG and DoD is illegal."

60.     Irazola was terminated four (4) business days later. Lombardo was terminated from FMG day following Irazola.

61.     On May 4, 2018, the OPA recompete was released to the public.  It was structured as FMG, Boehmer, and Beirne had discussed.  The project was awarded to FMG on June 20, 2018 to FMG.  The contract number is 47QFPA18D0004; the award amount is $49,140,932, and Deltek's GovWin software estimates the contract to cost between $50 million and $100 million over five years.

62.     The FVAP recompete was released to the public on September 26, 2018.  It was structured as FMG, Boehmer, and Beirne had discussed.  The project was awarded to Marketing for Change, Co. (a subsidiary of SalterMitchell, Inc.) as the prime contractor on January 30, 2019.  FMG is the subcontractor to Marketing for Change, Co.  The contract number is H9821019D0002; the award amount is $9,708,703. FMG will receive approximately 49% of the award as the subcontractor, totaling more than $4,700,000.

***Gender Discrimination and Retaliation***

63.     During an initial orientation in or about early September 2017, FMG program manager Sarah Keaton ("Keaton") told Irazola that Griepentrog had a problem with strong women.  Keaton also told Irazola that Irazola should "dial it back and remember that the owners were good mid-Western boys" who were "not used to dealing with confident women."

64.     Soon after Irazola started in her position, Griepentrog told Irazola that Sarah Evans, a former female director, was "not worth" more salary, sometime between September and November 2017.  Griepentrog also told Irazola that a former female employee had thought she had more value than her worth and was expecting a counteroffer but that "no woman was worth

that."

65.     Griepentrog continued to show his animus toward strong women.  Griepentrog told Irazola: "I am sorry you have such an inflated view of what your role should be in this company" or words to that effect, when Irazola questioned her position title in or around January 2018.

66.     In or around March 2018, Marsh called Irazola into his office and said: "It looks like you are in a hostile work environment."  Irazola confirmed another employee's report to Marsh, about Griepentrog's unfair and sexist treatment of Irazola, and Irazola agreed with Marsh's characterization of what Irazola and the other employee had reported as being a hostile work environment.

67.     Irazola spoke with Marsh a few days later and Irazola reported to Marsh that she felt like she was in a "battered wife situation" and Irazola reported to Marsh that Griepentrog treated another female subordinate poorly.  Marsh dismissed Irazola's concerns.

*Termination*

68.     A few weeks later, on April 9, 2018, Griepentrog, accompanied by HR Director Christina Daugherty, told Irazola that FMG was firing Irazola.  Griepentrog told Irazola, "Your values do not fit ours" and "You are not a fit for the culture here."

69.     Prior to this, FMG had not issued Irazola any written notice of any deficiencies with respect to either her performance or communication style, her values or her fit.  Indeed, quite the contrary, as FMG recently promoted Irazola to a VP position in February 2018.

70.     In March 2018, FMG announced via email the creation of an Executive Leadership Team which was described as having "a wealth of varied backgrounds and experiences, as well as a shared vision for the success of [FMG]."

71.     Irazola was one of only four (4) FMG employees selected to be a part of this Executive Leadership Team just weeks before her employment was terminated.

72.     FMG has a progressive disciplinary policy that it violated.  FMG first requires its managers to issue a verbal warning and then a formal written warning.  If neither warning is successful, FMG will put the employee on a formal performance remediation plan.  Only after these warnings and remediation plans have failed to correct the misconduct, will FMG terminate an employee.

73.     FMG violated its progressive disciplinary policy when it terminated Irazola without providing any verbal or written notice of deficiencies.

74.     FMG did not terminate similarly situated male employees without first giving them notice and opportunity to address any purported issues with their performance.

75.     Soon after starting at FMG, Irazola learned of a former male director, Kyle Andrews ("Andrews"), who had occupied her new office prior to her arrival.

76.     Andrews – a director at Irazola's level – had been fired months prior to Irazola's arrival.

77.     In September or October 2017, Irazola spoke with Carrie Von Bose ("Von Bose"), who used to be on Irazola's team, but who had since moved to another team.

78.     Irazola invited Von Bose to coffee, where Irazola learned of why Von Bose switched teams.

79.     At the time of Von Bose switching teams, the director of Public Policy Evaluation was Thad Hall ("Hall").

80.     Von Bose told Irazola that Hall was "going through his divorce," and "was creeping all of the single women out, including herself."

81.     For this and other reasons, Hall was demoted to a non-supervisory role, still retaining his annual salary of approximately $160,000.

82.     In approximately November 2017, Irazola caught Hall stealing from FMG; Hall was accepting speaking fees at conferences FMG would pay for him to attend.

83.     Following, Irazola discovered that Hall was also submitting expenses for DC's Metrorail as part of FMG's benefits to commuters; Hall lived across the street from FMG – a 5-minute walk which would not require commuting benefits.

84.     Irazola brought this to the attention of HR and Griepentrog; Griepentrog told Irazola that Hall "had to be treated gently" because "he was well-known in the field of voting."

85.     Griepentrog told Irazola that "he would handle this."

86.     In November 2017, Griepentrog told Irazola that "he granted Hall pay through the New Year while he [Hall] looked for another job."

87.      Following, Irazola was told by HR that Hall received additional funding to remain at FMG and was able to use Hall's vacation time.

88.     Hall's departure was not mentioned by the owners in their traditional email "farewell."

89.     Hall left FMG with his reputation intact.

90.     Hall started his position at FMG with Irazola's job and title and Irazola was making approximately the same amount of money as Hall.

91.     Around the same time, Von Bose told Irazola why Andrews was fired.

92.     Von Bose told Irazola that Andrews "had an anger problem" and it was "directed to his female subordinates" for more than six months.

93.     Von Bose also told Irazola that at least three of Andrews' subordinates requested

a meeting with Marsh after Andrews "openly yelled and shamed" one of the women.

94.    Marsh assured them confidentiality while investigating; days later, Marsh met with the subordinates again and insisted it was the subordinate's fault.

95.    At least three of the female subordinates departed FMG within months of the discussion with Marsh.

96.    Only when another female FMG director – Kinsey Gimbal ("Gimbal") complained about Andrews outbursts months later, did FMG terminate Andrews.

97.     Gimbal told Irazola "she'd had enough of seeing the abuse," and Gimbal told the owners of FMG it "was either him [Andrews] or me – one of us had to go."

98.    Andrews, a male, was of the same level and received approximately the same pay as Irazola.  According to Andrews' LinkedIn page, Andrews was employed by FMG for 1 year and 4 months.

99.    Kelly Wurtz, another male employee at FMG with a Ph.D., and a researcher on Irazola's team, was to be terminated but he was placed on a performance improvement plan ("PIP") for six weeks prior to being terminated.

100.    At the time Irazola put him on a PIP, she discovered a note in Wurtz's HR file that he had his DoD-issued laptop stolen from a strip club many months before; FMG did not terminate or penalize Wurtz at that time.

101.    A male, Griepentrog, is now performing Irazola's job duties.

102.    FMG's decision to terminate Irazola came less than one month of her discussing with Marsh about a "hostile work environment" and within days of her disclosing concerns about the improper communications and relationships between FMG and certain government employees.

103.    The day after FMG terminated Irazola, FMG terminated Lombardo, a woman and the only other employee at FMG who disclosed concerns about the improper and illegal communication between FMG and certain federal government employees.

**COUNT I**
**Discrimination**
**Violation of Title VII**
**42  U.S.C. § 2000e,** *et seq.*

104.    Irazola hereby incorporates and realleges the allegations set forth in the foregoing paragraphs as though fully alleged herein.

105.    As stated in this Court's Order dated June 28, 2019, Title VII discrimination claims require: "(1) membership in a protected class; (2) satisfactory job performance; (3) adverse employment action; and (4) different treatment from similarly situated employees outside the protected class." *Robinson v. Loudon Cty. Pub. Sch.*, 2017 WL 3599639, at *3 (E.D. Va. Aug. 18, 2017).

106.    Irazola meets all four elements to allege Title VII discrimination.

107.    Irazola is a female, and therefore a member of a protected class.

108.    Irazola has pled facts sufficient to establish satisfactory performance.

109.    Irazola was promoted to Vice President of Public Policy Evaluation in February 2018.

110.    Up to the point of Irazola's termination, Irazola was never given any written notice of deficiencies with respect to Irazola's performance.

111.    In March 2018, FMG announced the creation of an Executive Leadership Team which was described as having "a wealth of varied backgrounds and experiences, as well as a shared vision for the success of [FMG]."  Irazola was named as one of only seven (7) FMG employees on this team.

112.     Months of promotions and recognition, through public proclamations on Irazola's performance, establishes facts to show satisfactory performance.

113.     Irazola was terminated, which is an adverse employment action.

114.     Irazola experienced different treatment from similarly situated employees outside Irazola's protected class.

115.     Three men, Andrews, Wurtz, and Hall, were allowed to remain at FMG for weeks, and even months, after FMG decided to terminate Andrews, Wurtz, and Hall. Andrews and Hall were both hired into equivalent roles as Irazola, for approximately the same pay.

116.     Wurtz and Hall were on Irazola's team and both men had Ph.D.'s (like Irazola) and worked in a similar capacity as Irazola.

117.     FMG did not terminate Hall and Wurtz without first giving them notice and opportunity to address any purported issues with their performance.

118.     Both Wurtz and Hall received different and better treatment than Irazola, a member of a protected class.

119.     FMG did not terminate Andrews without first giving him notice and taking Andrews' account over his subordinates.

120.     Andrews was only terminated after a director-level employee reported Andrews' behavior to Marsh, several months after his subordinates who reported the behavior to Marsh left FMG.

121.     Andrews received different and better treatment than Irazola, a member of a protected class.

122.     FMG violated 42 U.S.C. § 2000e, *et seq.*, by terminating Irazola because Irazola is a female.

123.     FMG unlawfully discriminated against Irazola by treating her more harshly that it did other male employees when it terminated her.

124.     The reasons for terminating Irazola's employment are false and are pretext for unlawful discrimination.

125.     Irazola has exhausted her administrative remedies under Title VII.

126.     For FMG's unlawful discrimination against Irazola, pursuant to Title VII, Irazola is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by FMG, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

**COUNT II**
**Retaliation**
**Violation of Title VII**
**42  U.S.C. § 2000e,** *et seq.*

127.     Irazola hereby incorporates and realleges the allegations set forth in the foregoing paragraphs as though fully alleged herein.

128.     As stated in this Court's Order dated June 28, 2019, Title VII retaliation claims require an employee to participate in a protected activity.

129.     To constitute a protected activity a plaintiff must have been reporting employment actions that were "actually unlawful under Title VII or employment actions [Plaintiff] reasonably believe[d] to be unlawful."  *Savage v. Maryland*, 896 F.3d 260, 276 (4th Cir. 2015).

130.     Additionally, a protected activity can exist when an employee is participating in an ongoing investigation of proceedings under Title VII. *Laughlin v. Metro. Wash. Airports Auth.*, 149 F.3d 253, 259 (4th Cir. 1998).

131.     Irazola was approached by Marsh who stated that Irazola appeared to be in a "hostile work environment."

132.     Irazola reported to Marsh that she was indeed in a "hostile work environment", showing she believed the circumstances to be unlawful.

133.     Irazola disclosed to Marsh the experiences of female co-workers and of Irazola herself as they related to what Irazola perceived to be unfair and sexist treatment.

134.     Due to the sexist and poor treatment Irazola and Irazola's co-workers received, Irazola described to Marsh the circumstances as a "battered wife situation;" language which would not be used by someone who reasonably believes they are experiencing lawful behavior.

135.     Approximately one month after Irazola's disclosures with Marsh, FMG terminated Irazola's employment.

136.     Upon information and belief, FMG did not investigate any of Irazola's disclosures even though FMG has policies against discrimination and retaliation.

137.     FMG unlawfully retaliated against Irazola when it terminated Irazola's employment following her protected conduct and her protected conduct was a motivating factor in FMG's decision to terminate Irazola's employment.

138.     FMG had no legitimate or non-retaliatory business reason for the adverse actions it has taken against Irazola.

139.     FMG's stated reasons for terminating Irazola were pretext for its unlawful retaliation.

140.     Irazola has exhausted her administrative remedies under Title VII.
For FMG's unlawful retaliation against Irazola, pursuant to Title VII, Irazola is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by FMG, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

<u>COUNT III</u>
**Retaliation**
**Violation of the Anti-Retaliation Provisions of the Federal False Claims Act**
**31 U.S.C. § 3730(h)**

141.    Irazola hereby incorporates and realleges the allegations set forth in the foregoing paragraphs as though fully alleged herein.

142.    As stated in this Court's Order dated June 28, 2019, Federal False Claims Act retaliation claims require facts to support a protected activity.

143.    An activity is protected if the plaintiff "specifically alleged fraudulent claims for federal funds." *Salagh v. Virginia Int'l Univ.*, 2017 WL 976620, at *5 (E.D. Va. Mar. 13, 2017).

144.    Further, facts must be included in the complaint that "would allow the court to infer that [FMG] submitted a false or fraudulent claim to the government." *Id.*

145.    Any efforts by an employee to stop one or more false claims from being submitted is also protected activity under the FCA. 31 U.S.C. § 3730(h)(1).

146.    Irazola engaged in several efforts to stop FMG from submitting one or more false claims.

147.    Irazola warned Gregorowicz that FMG's efforts to acquire the FVAP (a contract involving federal funds) were illegal, which in turn makes any claims for payment on such a contract a fraud on the taxpayer, based on false certifications that go with such claims for payments.

148.    Irazola, believing herself to be in the presence of Griepentrog, and intending to be overheard by him, stated to a co-worker that certain communications between FMG employees and certain federal employees should not be happening as they evidence a conflict of interest which make such communications illegal.

149.    Irazola's continued efforts to raise awareness at FMG about the FVAP contract

led Lombardo to state to Vakalia that "Seri [Irazola] is concerned that this communication between FMG and DoD is illegal."

150.    The OPA project was awarded to FMG on June 20, 2018 to FMG.  The award amount is $49,140,932, and Deltek's GovWin software estimates the contract to cost between $50 million and $100 million over five years.

151.    The FVAP recompete was released to the public on September 26, 2018.  It was structured as FMG, Boehmer, and Beirne had discussed and FMG was awarded a role as a subcontractor on the project which has an award amount of $9,708,703.

152.    Irazola's numerous reports about FMG's illegal activity to acquire the FVAP and OPA contracts, and the eventual acquisition of the FVA and OPA contracts, demonstrate Irazola reasonably believed FMG would submit a false or fraudulent claim to the government when FMG sought payment on each of those contracts.

153.    FMG terminated Irazola because Irazola made efforts to stop one or more false claims from being asserted by informing FMG that its communications with certain government employees and FMG's tactics to win the upcoming contracts were improper.

154.    By discussing competitive contracts before they are made public and working with the director of a contract to change the RFP so that FMG could win the request, Irazola reasonably believed that FMG was conspiring to obtain a contract through fraudulent conduct.

155.    Irazola's disclosures implicate a fraud-in-the-inducement theory of liability under the False Claims Act.  Courts recognize a fraud-in-the-inducement theory of liability under the FCA where a contract benefit was originally obtained through false statements or fraudulent conduct.

156.    Where the award of a government contract is predicated upon illegal conduct

(such as unlawful communications between a contractor and government personnel), every claim for payment submitted thereafter is inherently false.

157.    Irazola engaged in FCA-protected activity when she:

a.    In September of 2017, Irazola expressed her concerns to Griepentrog about the regular contact FMG officials had with government personnel regarding the FVAP about efforts to manipulate an RFP so that FMG might more easily compete and win.

b.    In or about December 2017, Irazola advised Gregorowicz that it was not legal that Gregorowicz had frequently been in contact with FVAP staff – including the FVAP COR – to get information related to the upcoming recompete.

c.    In or about March of 2018, Irazola reiterated her concerns to Lombardo and discussed the improper communications between FMG and the government.  Lombardo told Irazola in or around early April of 2018 that Lombardo had relayed Irazola's concerns to Lombardo's supervisory chain at FMG.

d.    Irazola further stated to Lombardo, (in a loud enough voice so as to be overheard by Griepentrog), that it was inappropriate for contractors to speak with certain employees of the government about how to structure a solicitation as doing so could evidence a conflict of interest.

e.    In April of 2018, Irazola again disclosed her discomfort with the contacts between FMG and certain government employees during a conversation with Lombardo, in front of Griepentrog, in a tone of voice intending for Griepentrog to hear the conversation.

158.    FMG, through Griepentrog, had knowledge of Irazola's protected activity because Irazola directly told Griepentrog that she felt uncomfortable with the substance and the fact of Griepentrog's illegal conversation with Beirne.

159.    Following Irazola's disclosures, FMG retaliated against Irazola by terminating her

employment.

160.    The close temporal proximity between Irazola's efforts to stop false claims from being submitted and FMG's decision to terminate Irazola strongly suggests that Irazola's protected disclosures caused her termination.

161.    FMG, knowing that Irazola was engaging in such protected activity, terminated Irazola because of her protected conduct.

162.    FMG did not investigate Irazola's disclosures.

163.    For FMG's unlawful retaliation against Irazola, pursuant to the FCA, Irazola is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by FMG, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.

**COUNT IV**
**Whistleblower Retaliation**
**The 2013 National Defense Authorization Act,**
**41  U.S.C. § 4712,** *et seq.*

164.    Irazola incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

165.    As stated in this Court's Order dated June 28, 2019, the National Defense Authorization Act protects those who disclose "a violation of a law, rule, or regulation related to a Federal contract" to "a management official or other employee of the contractor … who has a responsibility to investigate, discover, or address misconduct." *Hooven-Lewis v. Caldera*, 249 F.3d 259, 276 (4th Cir. 2001).

166.    Irazola engaged in several efforts disclose violations of a law, rule, or regulation related to a federal contract to a management official or other employee of the contractor who had the responsibility to investigate the misconduct.

167.    Irazola warned Gregorowicz that FMG's efforts to acquire the FVAP (a contract involving federal funds) were illegal, which in turn makes any claims for payment on such a contract a fraud on the taxpayer, based on false certifications that go with such claims for payments.

168.    Irazola, believing herself to be in the presence of Griepentrog, and intending to be overheard by him, stated that certain communications between FMG employees and certain federal government employees should not be happening as they could evidence a conflict of interest which make such communications illegal.

169.    Irazola's continued efforts to raise awareness at FMG about the FVAP contract led Lombardo to state to Vakalia that "Seri [Irazola] is concerned that this communication between FMG and DoD is illegal."

170.    The FVAP recompete was released to the public on September 26, 2018.  It was structured as FMG, Boehmer, and Beirne had discussed and FMG was awarded a role as a subcontractor on the project which has an award amount of $9,708,703.

171.    The OPA project was awarded to FMG on June 20, 2018 to FMG.  The award amount is $49,140,932, and Deltek's GovWin software estimates the contract to cost between $50 million and $100 million over five years.

172.    Irazola's numerous disclosures about FMG's violation of a law, rule, or regulation related to a Federal contract to acquire the FVAP and OPA contracts, and the eventual acquisition of the FVA and OPA contracts, demonstrate Irazola reasonably believed FMG was violating the NDAA.

173.    FMG terminated Irazola because Irazola disclosed a violation of a law, rule, or regulation related to a Federal contract by informing FMG that its communications with certain

government employees and FMG's tactics to win the upcoming contract were improper.

174.     Furthermore, Irazola's efforts were to warn FMG that the DoD was encouraging a violation of a law, rule, or regulation related to a Federal contract by engaging in discussions with FMG.

175.     Irazola, on numerous occasions, disclosed information to colleagues who had a responsibility to investigate, discover, or address misconduct which existed between Boehmer and multiple employees of FMG.

176.     By discussing competitive contracts before they are made public and working with the director of a contract to change the RFP so that FMG could win the request, Irazola reasonably believed that FMG was conspiring to obtain a contract through fraudulent conduct.

177.     Irazola is an "employee" as that term is defined by the NDAA.

178.     FMG is a "contractor," "subcontractor," "grantee," or "subgrantee" as defined by the NDAA.

179.     Irazola has exhausted her administrative remedies under the NDAA by filing with the DoD/OIG over 210 days ago.

180.     The work performed by FMG on the FVAP and OPA Projects is subject to the provisions of 41 U.S.C. § 4712.

181.     FMG conspired with FVAP's director, Beirne, to reconstruct the FVAP's RFP so that FMG could successfully win the FVAP contract.

182.     Beirne conspired with FMG to ensure FMG would be awarded the FVAP contract.

183.     FMG conspired with OPA director, Boehmer, to reconstruct the OPA RFP so that FMG could successfully win the OPA contract.

184.    Boehmer conspired with FMG to ensure FMG would be awarded the OPA contract.

185.    FMG's discussions with certain government employees about FVAP before the release of the RFP was in violation of 41 U.S.C. § 2102, which prohibits seeking the disclosure of bid or proposal information or source selection before the award is released.

186.    Irazola disclosed to an FMG manager and owner, Griepentrog, that Irazola was uncomfortable with the discussion and meeting FMG managers had with Beirne.

187.    Griepentrog was a management official, among others, at FMG who had the responsibility to investigate, discover, or address the misconduct under 41 U.S.C. § 4712(a)(2)(G), including the misconduct by Beirne towards FMG employees.

188.    Irazola made this disclosure to Griepentrog because Irazola reasonably believed that Beirne's and FMG's conduct was "an abuse of authority relating to a Federal contract or grant." 41 U.S.C. § 4712(a)(1).

189.    FMG terminated Irazola because of her protected disclosures.

190.    For FMG's unlawful retaliation against Irazola, pursuant to the NDAA, Irazola is entitled to general and special damages, economic damages including front and back pay, reinstatement, promotion, compensatory damages, reasonable attorney's fees to be paid by FMG, as well as her costs and any other legal and/or equitable relief that this Court deems appropriate.


**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff Seri Irazola respectfully requests that the Court enter judgment in her favor and award to her the following relief:

A.      Judgment against FMG in an amount of any wages, salary, employment benefits, or other compensation denied or lost to Irazola, including economic damages, liquidated damages, compensatory and special damages of $2 million or another amount to be determined at trial;

B.      Re-employment, reinstatement, promotion, front pay and benefits, or other equitable relief;

C.      Pre-judgment interest;

D.      Interest due on unpaid wages;

E.      A reasonable attorney's fee and costs of this litigation;

F.      Reasonable expert witness fees; and

G.      Any other relief that this Honorable Court deems just and proper to award.

## JURY DEMAND

Plaintiff demands a jury for all issues proper to be so tried.

Respectfully submitted,

_____/s/ Adam Augustine Carter_____
R. Scott Oswald (VA Bar No. 41770)
Adam Augustine Carter (VA Bar No. 32722)
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com
*Counsel for Plaintiff*